Dwight DURAN, Lonnie Duran, Sharon Towers, and all others similarly situated, Plaintiffs,

v.

Toney ANAYA, Governor, Michael Francke, Sec'y of Corrections, Charles Becknell, Sec'y of Criminal Justice, Levi Romero, Warden, Penitentiary of New Mexico, Robert Montoya, Joseph Lujan, Defendants.

Civ. No. 77–0721–JB.

United States District Court, D. New Mexico.

June 27, 1986.

Ray Twohig, Albuquerque, N.M., for plaintiffs.

John Bigelow, Sp. Asst. Atty. Gen., Santa Fe, N.M., for defendants.

## MEMORANDUM OPINION

BURCIAGA, District Judge.

### INTRODUCTION

On May 22, 1986, plaintiffs filed their *Motion for a Preliminary Injunction to Prevent Irreparable Harm by Halting Layoffs of Staff and Filling Staff Vacancies.* Plaintiffs sought an order requiring defendants to

(1) cancel the layoffs of all New Mexico Department of Corrections employees scheduled to take effect on July 1, 1986 and cease any additional layoffs;

(2) fill all vacant positions (positions that are currently unfilled and those that become vacant in the future);

(3) rescind the directive requiring an additional 2% cut in the New Mexico Department of Corrections budget for any institutions covered by this Court's previous orders, and cease and desist from any further reductions in the budget, services, or sources provided to the institutions covered by this Court's orders;

(4) for each institution where defendants fail to comply with the directives contained in paragraphs 1, 2 and 3 above, cease to confine prisoners in said prison no later than 30 days following the entry of this order; and

(5) close the dormitories at the Penitentiary of New Mexico.

For the reasons set forth in this Memorandum Opinion, defendants will be enjoined from reducing the level of medical and mental health staff below the number of such staff authorized or approved to be employed by the New Mexico Corrections Department during Fiscal Year 74, and to refrain from reducing the authorized or approved complement of security staff at the Penitentiary of New Mexico, Central New Mexico Correctional Facility, Southern New Mexico Correctional Facility or Western New Mexico Correctional Facility unless the minimal staffing levels identified as being necessary to provide a constitutional level of safety and security for prisoners have been achieved at those institutions. The Court also will enjoin defendants to fill existing vacancies and thus to employ at least the number of medical and mental health staff as well as the number of security staff authorized to be employed by the New Mexico Corrections Depart-

ment during Fiscal Year 74, including temporary positions approved during that year.

The Court will deny plaintiffs' motion for an order rescinding any directive requiring an additional 2% cut in the New Mexico Department of Corrections budget and will not enjoin defendants to cease and desist from any further reductions in the budget, services or resources provided to the institutions covered by this Court's orders, so long as the levels of medical, mental health and security staff mandated by the preliminary injunction are met. Likewise, the Court will deny plaintiffs' motion to cease confining prisoners in any prison that is not appropriately staffed and will deny plaintiffs' motion for an order enjoining defendants to close the dormitories at the Penitentiary of New Mexico.

Plaintiffs' motion, which was opposed by defendants, does not exist in a vacuum. On December 2, 1985, defendants filed a motion to vacate or modify the judgment in this cause. On that same date plaintiffs moved for modification of certain of the remedial orders in this cause, and filed a motion for contempt. All motions were opposed.

On January 10, 1986, the Court entered an order that plaintiffs' motion for contempt be severed into its two components, a motion for civil contempt and a motion for criminal contempt. The Court at that time denied plaintiffs' motion for criminal contempt. The Court simultaneously entered an order assigning to the Special Master appointed in this litigation specific fact finding duties with respect to plaintiffs' pending motion for civil contempt. Specifically, the Special Master was directed to prepare proposed findings of fact with respect to all allegations of contempt contained in plaintiffs' motion and to submit those proposed findings to the parties. The Court announced that, at the time of that submission, plaintiffs would be required to amend their motion for contempt to provide clear and concise statements of the basis of their claim for relief, as well as the identity of all persons against whom they seek a finding of contempt. On the

basis of that pleading, and any response thereto by defendants, the Court indicated it would determine whether an order directing defendants or others to show cause why they should not be held in contempt should issue.

In early June 1986, the Special Master informed the Court that the proposed findings of fact required by the Court's earlier order had been prepared and submitted to the parties. On June 6, 1986, the Court entered an order requiring the parties to submit any objections they might have to the Special Master's proposed findings no later than July 18, 1986. On or before August 8, 1986, the Special Master is required to file with the Court all findings of fact to which neither party has objected. Proposed findings to which one or both parties object may be the subject of requests for admission to Rule 36 of the Federal Rules of Civil Procedure. Finally, the Court's June 6, 1986 order directed plaintiffs to file, no later than August 22, 1986, an amended motion providing clear and concise statements of the basis of their claim for relief, as well as the identity of all persons against whom plaintiffs seek a finding of contempt.

Plaintiffs' pending motion for contempt seeks a finding of contempt and sanctions for alleged non-compliance with the Court's orders relating to medical care, mental health care, security staffing and the closure of dormitories at the Penitentiary of New Mexico. Defendants' motion to modify seeks vacation or substantial modification of the provisions of the Court's order relating to medical care, mental health care, and security staffing. Thus, the Court contemplates that a plenary hearing will be held on these matters as quickly as possible after plaintiffs have filed their amended complaint, defendants have had an opportunity to respond to that complaint, and any necessary discovery has been completed.

Apart from the pending motions for contempt and modification, plaintiffs' motion for a preliminary injunction implicates several of the 20 comprehensive compliance

reports that have been filed by the Special Master and confirmed by the Court since the Special Master's appointment in June 1983. On April 19, 1984, the Special Master filed his fourth report, which related to system-wide medical care. That report was confirmed, without objection by defendants, by order entered on June 4, 1984. The Special Master's fifth report, filed on April 18, 1984, related to mental health care throughout the New Mexico Corrections Department. Neither party filed any objection to the findings or recommendations contained in that report, which was confirmed by order entered on June 4, 1984. The Special Master's sixteenth report, relating to medical care and mental health care throughout the New Mexico Corrections Department, was filed on August 23, 1985. After sustaining defendants' objection to a finding concerning the existence of mental health logs at Central New Mexico Correctional Facility, the Court confirmed the Special Master's sixteenth report by order entered on June 6, 1986.

The Special Master's fourth, fifth and sixteenth reports contain factual observations indicating serious deficiencies in the state of defendants' compliance with the Court's orders on medical care and mental health care. These factual observations were adopted as findings of fact by the Court and are part of the record of this case.

The Special Master's second report, filed on March 5, 1984, addressed security staffing issues at the Penitentiary of New Mexico, Central New Mexico Correctional Facility and Southern New Mexico Correctional Facility. No party filed any objection to the findings or recommendations set forth in that report, which was confirmed by order entered on April 2, 1984.

The Special Master's second report established, through adoption of the recommendations of the Court's expert consultant on security staffing, minimal levels of security staffing required to be implemented to provide reasonable safety and security at the Penitentiary of New Mexico, Central New Mexico Correctional Facility and Southern New Mexico Correctional Facility. The Special Master's factual observations regarding the minimal levels of security staffing required at these institutions were adopted as findings of fact by the Court and are part of the record in this case.

Subsequently, on February 11, 1985, the Special Master filed his seventeenth report on defendants' state of compliance at Southern New Mexico Correctional Facility. That report, to which neither party filed any objection, was confirmed on February 11, 1985. The Special Master's seventeenth report contained a number of factual observations relating to defendants compliance with the security staffing provisions of the Court's order in this cause, and those factual observations were adopted as findings of fact by the Court.

On March 29, 1985, the Special Master filed his eighteenth report relating to the state of defendants' compliance with the Court's orders at Central New Mexico Correctional Facility. That report contained a number of factual observations relating to defendants' state of compliance with the security staffing provisions of the Court's order at Central New Mexico Correctional Facility, to which no objection was made by either party. The Special Master's eighteenth report was confirmed by order entered on May 14, 1985, and the Special Master's factual observations were adopted as findings of fact by the Court.

The Special Master filed his nineteenth report relating to defendants' state of compliance at the Penitentiary of New Mexico on June 3, 1985. The nineteenth report contained, *inter alia*, factual observations by the Special Master concerning defendants' state of compliance with the security staffing provisions of the Court's order at the Penitentiary of New Mexico. By order of June 11, 1986, the Court adopted as findings of fact all factual observations of the Special Master relating to security

staffing, and these findings of fact became part of the record in this case.[1]

Finally, on January 26, 1986, the Special Master submitted his twentieth report relating to defendants' state of compliance at Western New Mexico Correctional Facility. That report contained the recommendations of the Court's expert consultant on security staffing regarding the minimal level of security staff required to provide reasonable safety and security to prisoners at Western New Mexico Correctional Facility. The Special Master's recommendations with respect to the minimal security staffing level required, as well as all factual observations relating to security staffing contained in the twentieth report, were confirmed by order entered on June 12, 1986.

The foregoing reports of the Special Master relating to security staffing contain numerous factual observations relating to defendants' compliance with the security staffing provisions of the Court's order in this cause. A number of those factual observations, it should be noted, indicate non-compliance by defendants with security staffing requirements in general, and the level of security staffing in particular.

In summary, plaintiffs' motion for a preliminary injunction seeks an order enjoining reductions in current authorized levels of medical, mental health and security staff following significant findings of non-compliance relating to these issues in reports filed by the Special Master and confirmed by the Court. Moreover, plaintiffs' motion for preliminary injunction is filed while cross motions for modification, including defendants' motion to vacate or modify the medical, mental health and security staffing provisions of the Court's order, as well as plaintiffs' motion for contempt, are pending before the Court. It is in this context that the Court must evaluate relevant factual evidence adduced by the parties and apply controlling principles of law to plaintiffs' motion.

The parties agreed to submit all evidence relating to plaintiffs' motion for preliminary injunction by way of deposition or in documentary form. This evidence consisted of the deposition of George E. Sullivan, the Warden of the Penitentiary of New Mexico, together with several exhibits to that deposition; the deposition of Alan Shuman, Deputy Secretary of the New Mexico Corrections Department, together with certain exhibits to that deposition; the deposition of Michael Francke, Secretary of the New Mexico Corrections Department, together with several exhibits to that deposition; the deposition of Henry Cellini, Ph.D., the former Director of Mental Health Services for the New Mexico Corrections Department, together with exhibits to that deposition; the deposition of John S. Kormanik, the Director of Administrative Services Division of the Corrections Department, and Mr. Stephen D. Olsen, the Budget Director for the New Mexico Corrections Department, together with an exhibit to that deposition; the deposition of Jeffrey L. Metzner, M.D., plaintiffs' psychiatric expert; the deposition of Ronald M. Shansky, M.D., defendants' medical expert; the deposition of Dennis F. Koson, M.D., defendants' psychiatric expert; the deposition of Lloyd T. Baccus, Ph.D., the Court's expert consultant on mental health care; the deposition of Lambert N. King, M.D., the Court's expert consultant on physical medical care; and the deposition of C.W. Beaver, the Court's expert consultant on

---

1. Subsequent to the filing of the Special Master's nineteenth report, the Court's expert consultant on security staffing reassessed security staffing levels at the Penitentiary of New Mexico. This reassessment was occasioned by the imminent opening of the North Facility and the closure or reallocation of certain housing units in the Main Facility at PNM. The expert consultant, Mr. C.W. Beaver, submitted a report of his findings and recommendations on September 5, 1985. That report contains the consultant's recommendations regarding minimal security staffing levels required at the Penitentiary of New Mexico—Main Facility and the Penitentiary of New Mexico—North Facility to provide a reasonably safe and secure environment for prisoners confined in those facilities. Mr. Beaver's recommendations, which amend those relating to the Penitentiary of New Mexico contained in the Special Master's second report, were filed by plaintiffs in connection with their motion for preliminary injunction as Exhibit 6 to the February 1986 deposition of PNM Warden George Sullivan.

security staffing. In addition, the parties submitted a stipulation regarding the testimony to be given by George E. Sullivan, the Warden of the Penitentiary of New Mexico, Dareld Kirby, the Warden of Central New Mexico Correctional Facility, Eloy Mondragon, the Warden of Southern New Mexico Correctional Facility, and Tom Newton, the Warden of Western New Mexico Correctional Facility. Finally, several exhibits to plaintiffs' memorandum in support of their motion for preliminary injunction and plaintiffs' reply memorandum in support of their motion for preliminary injunction were admitted into evidence. All the evidence described above was admitted without objection. In addition to receiving written and documentary evidence, the Court heard oral arguments by counsel in an open hearing conducted on June 18, 1986.

The Court has reviewed carefully the evidence submitted by the parties in support of their respective positions. On the basis of that review the Court has found relevant facts to which controlling principles of law must be applied. These findings of fact and conclusions of law follow.

## FINDINGS OF FACT

I. PHYSICAL MEDICAL CARE:

1. The number of positions authorized for medical care during Fiscal Year 74 (July 1, 1985 through June 30, 1986) is 95.7. The number of medical positions authorized for Fiscal Year 75 (July 1, 1986 through June 30, 1987) is 56. In addition to these 56 positions, 19.6 positions will be filled by contract or temporary personnel. A total of 20.1 positions, or approximately 21% of the medical positions authorized for Fiscal Year 74, will not be filled in Fiscal Year 75. (Stipulated finding no. 4)

2. The proposed budget reductions will have a devastating effect on the quality of medical care throughout the New Mexico Corrections Department. (King deposition, p. 9)

3. Budget reductions proposed for the medical department of the New Mexico Corrections Department will initiate a deadly cycle of deterioration in the provision of health care services, will make it virtually impossible for existing deficiencies to be remedied and will compromise markedly the quality of care throughout the system. (King deposition, p. 10)

4. The effect of proposed reductions in the medical staff throughout the New Mexico Corrections Department will be deterioration of the overall quality of routine medical care, significant delays in the diagnoses of illnesses that may result in death and the inability to provide necessary emergency care, the need for which will arise with greater frequency if the prison population continues to grow beyond its current level. (King deposition, pp. 19–20)

5. Adequacy of basic medical services will no longer be assured and preventable morbidity and mortality will increase significantly. (Memorandum in Support of Plaintiffs' Motion, Exhibit D)

6. Should the reductions occur as scheduled on July 1, 1986, an emergency situation will exist with respect to health services within New Mexico Corrections Department facilities. Much of the extraordinary progress which has been made will be in immediate jeopardy. Within a few months of these reductions, a demonstrable increase in morbidity and mortality is extremely probable. (Memorandum in Support of Plaintiffs' Motion, Exhibit D)

7. Staff reductions in the medical care department of the New Mexico Corrections Department will have a system-wide impact because of the existence of a central reception facility, a central infirmary facility and the centralization of a number of other important aspects of medical care delivery. (King deposition, pp. 10, 47)

8. In the 1985–86 fiscal year, the Corrections Department was appropriated approximately $1,313,000 for contractual medical and mental health services. Actual expenditures in this area for the same period are currently projected to be between $1,258,000 and $1,408,000. In the 1986–1987 fiscal year, the Department was ap-

propriated $1,600,000 for such contract services. (Stipulated finding no. 12)

9. The effort of the New Mexico Corrections Department to ameliorate the negative effect of reductions in medical staff by converting 19.6 positions to contract status will be unsuccessful, as the reductions in staff will increase the number of referrals to outside hospitals and sub-specialty consultants. These referrals will consume funds available for contractual services, and the Fiscal Year 75 contractual services budget will not be sufficient to meet all projected needs. (King deposition pp. 11–12)

10. Proposed staff reductions in the office of Health Services in the New Mexico Corrections Department will have the following specific negative effects:

a. The medical records system, already deficient in some respects, will deteriorate, with a consequent significant increase in the probability that important laboratory results or x-ray results will not be followed up properly. (King deposition, p. 12)

b. The ability of the health delivery system to respond appropriately to emergent medical needs during the evening, night and weekend hours will be compromised to an irreparable degree. (King deposition, p. 13)

c. The ability of the Health Services system to recruit and retain the kind of professionals necessary to provide adequate medical care will be devastated. (King deposition, p. 13)

d. Compliance with the provisions of the Court's order on medical care will become virtually impossible. (King deposition, p. 15)

e. If a substantial increase in population occurs at existing institutions, more prisoners will be at risk as a result of medical staff reductions. Any such population increase will have deleterious effects in terms of increased risk of transmission of infectious diseases, increased stress and increased demand on medical services. Any such population increase also will necessitate increased staffing for the provi-

sion of emergency care. (King deposition, pp. 15–16)

f. The reductions will interfere with needed in-service training and education for medical staff and will eliminate the safety net that has existed in the past in the form of the ability of existing staff to adjust for temporary losses during periods when a position is vacant. (King deposition, pp. 10–11)

11. The proposed reduction in psychological services staff throughout the Corrections Department will result in a marked increase in demands on physical medical staff, e.g., monitoring the side effects of anti-psychotic medication that can have irreversible effects on the central nervous system in the form of retardation and amnesia. (King deposition, pp. 17–18)

12. The proposed reduction of five registered nurses scheduled for staffing the acute care psychiatric unit at the Penitentiary of New Mexico is extremely dangerous because of the close medical monitoring required by psychotic patients. Health Services (as opposed to psychological services) staff will not be able to adequately monitor these patients. (King deposition, p. 31)

13. The reduction of Health Services staff contemplated as a result of the reduced budget approved by the New Mexico legislature will, in opinion of defendants' medical expert, create significant problems in the very near future. These problems include a medical records system breakdown, staffing shortages in terms of providing both routine and emergency care and the inability to recruit and retain staff. (Shansky deposition, p. 22)

14. Defendants' medical expert testified that three additional licensed practical nurse positions, two and one-half additional clerical positions, and one-half additional dentist's position beyond the level of staffing projected for Fiscal Year 75 are needed to prevent irreparable damage to the ability of the State to provide medical services, both emergent and routine. These additional staff are required to prevent a medi-

cal catastrophe. (Shansky deposition, pp. 7, 8) [With respect to LPN positions, *see* Shansky deposition, pp. 10, 13 and 14. With respect to clerical positions, *see* Shansky deposition, pp. 11, 13 and 14–15. With respect to dental positions, *see* Shansky deposition, pp. 14, 17.]

16. The Penitentiary of New Mexico, Western New Mexico Correctional Facility and Southern New Mexico Correctional Facility have not had significant excess medical staff in their budgets. (King deposition, p. 48)

17. The Health Services office of the New Mexico Corrections Department will almost certainly run far short of monies that are necessary to continue to provide the most basic level of institutional care, as well as outside care, well in advance of the end of Fiscal Year 75. (King deposition, p. 51)

18. The system-wide total population on June 10, 1986 at Southern New Mexico Correctional Facility, Central New Mexico Correctional Facility, Western New Mexico Correctional Facility and the Penitentiary of New Mexico was 1,938. (Stipulated finding no. 10)

19. The Corrections Department has averaged a net gain in inmate population system-wide of approximately 19 inmates per month, and growth is expected to continue at the present rate for the next fiscal year. (Stipulated finding no. 5)

20. One hundred and thirty-six prisoners were housed in day rooms or common areas at Western New Mexico Correctional Facility, Southern New Mexico Correctional Facility and Central New Mexico Correctional Facility on June 10, 1986. (Stipulated finding no. 7)

21. The Health Services Administrator employed by Defendants at Central New Mexico Correctional Facility has acknowledged that a substantially increased population at that institution will result in an increased spread of influenza, hepatitis, infectious gastroenteritis, venereal disease and AIDS. The Central New Mexico Correctional Facility Health Services Adminis-

trator also acknowledged that a substantial increase in population will increase psychological stress resulting in fist fights, overdoses, stabbings, suicide attempts, mental stress and trauma resulting in hospitalization and death. Finally, defendants Health Services Administrator for CNMCF acknowledged that a substantial increase in population at that institution will greatly increase demand for medical services. (King deposition, appendix D)

22. Five of the medical positions projected to be lost commencing July 1, 1986, have not been filled in the last year; one medical position scheduled to be lost on July 1, 1986, was not filled for at least six months during last year. (Stipulated finding no. 13)

23. The Corrections Department sought an increase of three full time equivalent medical positions for the Penitentiary of New Mexico (North Facility) and a .5 full time equivalent medical position at Western New Mexico Correctional Facility. The three full time equivalent medical positions at the Penitentiary of New Mexico (North Facility) were intended to provide on site medical service at the North Facility, and the .5 full time equivalent position at Western New Mexico Correctional Facility was intended to provide a records clerk. (Francke deposition, Exhibit 21 at p. 733; Francke deposition, p. 395–96)

24. It is the opinion of Secretary of the New Mexico Corrections Department that it will be impossible to provide the level of medical care mandated by the Court's orders in *Duran v. Anaya* within the restrictions imposed by the Fiscal Year 75 budget for adult health services. (Francke deposition, p. 398)

25. The vacancy rate among medical staff positions increased after the Legislative Finance Committee budget was published, and the finalization of the Fiscal Year 75 budget created a desperate situation with regard to filling medical vacancies for the remainder of Fiscal Year 74. As a result, the Corrections Department will be significantly impaired in its ability to deliver a wide range of medical services

into the foreseeable future. (Francke deposition, pp. 401–02)

26. The adult health services division of the Corrections Department historically has been beset by problems in recruiting and retaining qualified staff. (Francke, deposition, p. 402)

27. If Health Services positions are eliminated and then restored, substantial difficulty and delay will be incurred in filling those positions. This difficulty and delay will result from the significant deterioration of the health care system, which will make it more difficult to recruit qualified professionals. (King deposition, pp. 18–19)

28. On February 18, 1986, the Secretary of the New Mexico Corrections Department informed Governor Toney Anaya that the impact of proposed staffing reductions in the medical area "will devastate our medical ... and dental system." The Secretary also stated that the effect of these reductions would be "an increased likelihood of physical suffering and loss of life in the institutions. This includes staff as well as inmates." The Secretary described the effect of staffing reductions in the medical care area in the following terms:

> However, we have dismantled the medical system, leaving our Correctional Officers to struggle with medical emergencies and insane-inmates. We have had three Officers in the hospital in the last several weeks as the result of attacks by insane inmates even as our psychiatric nurses were quitting in response to the job security panic caused by the LFC budget cuts in medical. These cuts now are a reality. (Francke deposition, Exhibit 22, p. 3)

The Secretary of Corrections predicted that, if the staffing reductions contemplated by the Fiscal Year 75 budget occur, "the toll of the inevitable disturbances [will] rise." (Francke deposition, Exhibit 22, p. 3) The Secretary's comments were based on an assumption that 41 positions of 126 would be cut. In fact, primarily because of the employment of contract and temporary personnel, 31.6 medical and mental health positions from a total of 127.7 such positions authorized during Fiscal Year 74 will not be filled in Fiscal Year 75. (Francke deposition, Exhibit 22, p. 2; Stipulated finding no. 4)

29. On January 30, 1986, the Secretary of the New Mexico Corrections Department informed Governor Toney Anaya that the reduction in medical staff positions would jeopardize the provision of 24–hour nursing coverage. He stated, "The medium institutions have a steady stream of medical emergencies after normal work hours and loss of coverage after hours could jeopardize human life." (Francke deposition, Exhibit 25, p. 2)

30. On January 24, 1986, the Secretary of the New Mexico Corrections Department made the following written comment to New Mexico State Representative Jerry Sandel, Chairman of the Legislative Finance Committee:

> There is no realistic way to meet our consent decree obligation of adequate medical and mental health care to provide for basic health needs with a reduction of 41 FTE and a difference of over a million and a half dollars from the executive recommendation. Such a severe cutback raises a question of our ability to comply with the minimal standards of the constitution in the medical and mental health care areas. ... If the legislature cuts our medical staff drastically, we will not be able to build back up to the required levels for a long time, perhaps measurable in years. This is due to our difficulty in recruiting medical personnel to work in a correctional setting at salaries the State provides. We have an excellent health system now and my comments to the media were based on a belief that the cuts proposed by the LFC in this are wrong. (Francke deposition, Exhibit 26, p. 3)

## II. MENTAL HEALTH CARE:

1. Thirty-two psychologists and mental health support personnel were authorized in the Fiscal Year 74 budget for the New Mexico Corrections Department. The Fiscal Year 75 budget will result in the elimi-

nation of 11.5, or 36%, of these positions. (Stipulated finding no. 1)

2. Two psychologist positions at the Penitentiary of New Mexico and one psychologist position at Southern New Mexico Correctional Facility were not filled for at least six months during Fiscal Year 74. (Stipulated finding no. 13)

3. There are significant deficiencies in the delivery of routine essential psychiatric services to prisoners in the New Mexico Corrections Department. (Baccus deposition, pp. 6–8) The effect of proposed staffing reductions in the mental health area will further compromise the Department's ability to provide routine, adequate mental health care, including emergent care. (Baccus deposition, pp. 10–11; Metzner deposition, pp. 12–13)

4. There are prisoners throughout the New Mexico Corrections Department who are not receiving needed in-patient psychiatric services as well as necessary intermediate psychiatric care. Some of those individuals are at risk to endanger themselves or others in the absence of the required care. (Baccus deposition, pp. 67–68; Metzner deposition, p. 9)

5. Historically, the funding of the New Mexico Corrections Department has not been sufficient to meet the clinical needs for psychiatric treatment of the inmate population. (Baccus deposition, pp. 69–70)

6. There are prisoners in the New Mexico Corrections Department at this time who are suffering irreparable harm in the form of psychic distress for which adequate treatment is not being given. (Baccus deposition, p. 77) The number of prisoners who suffer such harm and the degree of that harm will increase if the staffing reductions required by the Fiscal Year 75 Corrections Department budget go into effect and existing vacancies are not filled. (Baccus deposition, p. 77)

7. If staffing reductions occur, out-patient services will be reduced at Southern New Mexico Correctional Facility and Central New Mexico Correctional Facility, where mental health services necessarily will focus increasingly on providing emergency evaluation and assessments, dispositional assessments, crisis intervention and short-term group therapy. (Baccus deposition, p. 12)

8. The most severe impact of the mental health staffing reductions will be felt at the Penitentiary of New Mexico. Resources will not be adequate to provide required intermediate or acute treatment. (Baccus deposition, p. 13)

9. Filling current vacancies and halting proposed reductions of mental health staff will reduce the likelihood of unnecessary pain and suffering by prisoners in the New Mexico Corrections Department. (Baccus deposition, p. 13; Metzner deposition, p. 14) The pain and suffering that will be avoided include self-mutilating behavior, suicidal behavior, assaultive behavior and impairment of the capacity for self care. Symptoms that will be avoided include hallucinations, delusions, sense of fear, foreboding, helplessness and depression. (Baccus deposition, p. 14)

10. If current vacancies are not filled and scheduled layoffs halted, a significant number of prisoners will experience deterioration in their mental health, non-compliance with their medication regimen, a greater likelihood of unprovoked, assaultive or self mutilating behavior or instances of impaired judgment resulting in increased disciplinary actions and/or behaviors. These actions will place the affected prisoners, their peers and correctional and administrative staff at risk. (Baccus deposition, p. 15)

11. Proposed reductions in mental health staff will reduce the capacity of the Department to identify prisoners who require treatment for mental illness or mental retardation. (Baccus deposition, pp. 15–16)

12. The projected reduction in mental health staff will render impossible or adversely affect compliance with numerous provisions of the Court's order on mental health care. (Baccus deposition, pp. 16–20)

13. The mental health programs of the Penitentiary of New Mexico and those in place at Southern New Mexico Correctional Facility, Central New Mexico Correctional Facility and Western New Mexico Correctional Facility are interrelated. The proposed reduction in mental health staff at the Penitentiary of New Mexico will result in attempts to retain at the satellite institutions prisoners who require acute and intermediate care that should be offered at the Penitentiary of New Mexico. This in turn will result in increased self destructive behavior by prisoners at the medium security institutions and a consequent increase in the incidence of assaults and behavioral management problems arising from increased mental health problems within the populations of those institutions. (Baccus deposition, pp. 21–22; Koson deposition, p. 36)

14. The forensic unit at the State Hospital in Las Vegas, New Mexico has never provided an adequate response to the need of prisoners for acute psychiatric care. (Baccus deposition, p. 39)

15. If the mental health staff authorized for Fiscal Year 74 are employed during Fiscal Year 75, it will be possible for an acute care unit to be opened at the Penitentiary of New Mexico. (Baccus deposition, p. 72) Particularly in view of the limited usefulness of the forensic treatment unit at the New Mexico State Hospital, there is a pressing need for the opening of an acute care unit to be operated by the Corrections Department. (Baccus deposition, pp. 72, 39.)

16. The staffing reductions projected for Fiscal Year 75 will make it impossible for the Corrections Department to open an acute care mental health unit. (Francke deposition, p. 400)

17. Increased reliance on the forensic treatment unit of the New Mexico State Hospital in Las Vegas is not a realistic option for the provision of acute care to mentally ill prisoners. The State Hospital is reluctant to accept violent, mentally ill felons who are predatory and assaultive. (Francke deposition, p. 399)

18. The prospective termination of mental health staff on July 1, 1986 has increased and will continue to increase difficulties in recruiting and retaining mental health personnel, and will have an adverse impact on the morale of the remaining staff. (Baccus deposition, p. 70; Francke deposition, pp. 401–02)

19. Other than crisis intervention, no mental health treatment is being afforded to female prisoners at Western New Mexico Correctional Facility. (Baccus deposition, p. 72; Koson deposition, p. 28)

20. Defendants' psychiatric expert testified that the present level of mental health staffing at the Penitentiary of New Mexico is insufficient to provide minimally adequate treatment because of the absence of an in-patient facility for the provision of acute care. (Koson deposition, pp. 10–11)

21. Defendants' psychiatric expert testified that five support staff are necessary at the Penitentiary of New Mexico to provide minimally adequate psychiatric care to prisoners at that facility. Only two such staff are authorized for Fiscal Year 75. (Koson deposition, p. 12; Stipulated finding no. 4)

22. Defendants' psychiatric expert testified that the current level of seven psychologists is required to provide minimally adequate psychiatric care to prisoners at the Penitentiary of New Mexico. Only six psychologist positions are authorized for Fiscal Year 75. (Koson deposition, pp. 8, 27; Stipulated finding no. 4)

23. Defendants' psychiatric expert testified that approximately ten prisoners at the Penitentiary of New Mexico require in-patient acute care that cannot be delivered under present circumstances. (Koson deposition, p. 15)

24. Defendants' psychiatric expert testified that the loss of one psychologist position at Western New Mexico Correctional Facility would impair "a system-wide case finding of diagnostic effort, but not to the extent that irreparable harm would be caused." (Koson deposition, p. 17)

25. Defendants' psychiatric expert testified that any reduction in the number of psychologists at Central New Mexico Correctional Facility would require the cessation of essential mental health services to a number of prisoners at that facility. One psychologist position has been eliminated in the Fiscal Year 75 budget. (Koson deposition, p. 19; Stipulated finding no. 4)

26. Defendants' psychiatric expert testified that any reduction in secretarial personnel for the mental health program at Central New Mexico Correctional Facility would be unacceptable and would cut directly into professional staff time. One half position has been eliminated in the Fiscal Year 1975 budget. (Koson deposition, p. 22; Stipulated finding no. 4)

27. It is the opinion of the former and current mental health directors of the New Mexico Corrections Department that 96 beds are needed to provide intermediate level psychiatric care. At the present time, only 48 beds are available for that level of care. The expansion of the number of intermediate care beds will require additional mental health staff. (Metzner deposition, pp. 57–59)

28. Defendants' psychiatric expert testified that prisoners who are in need of intermediate psychiatric care, but who are assigned to the general population at the Penitentiary of New Mexico, are suffering irreparable harm. (Koson deposition, p. 31)

29. In the event of increased population and a decrease in other treatment programs such as educational programming, the need for mental health services will increase. (Koson deposition, p. 37)

30. Defendants' psychiatric expert testified that the number of prisoners who suffer irreparable harm and the degree of that irreparable harm will increase if the mental health staffing reductions presently proposed go into effect and existing vacancies are not filled. (Koson deposition, pp. 39–40)

31. The Secretary of the New Mexico Corrections Department testified that budget reductions relating to mental health personnel will cause the Department to "be unable to provide mental health care mandated by the decree [in *Duran v. Anaya*] to any significant respect." On February 18, 1986, the Secretary informed Governor Toney Anaya that the impact of proposed staffing reductions "will devastate our ... mental health system." He stated that the proposed staff reductions would result in "an increased likelihood of physical suffering and loss of life in the institutions. This includes staff as well as inmates." (Francke deposition, p. 398; Exhibit 22, p. 2)

32. The Secretary of the New Mexico Corrections Department testified that the most substantial problem resulting from proposed staffing reductions in the medical area "involves the mental health requirements of the decree which deal with people who are suffering from mental illness, people who have an acute phase of a mental illness, people who have alcohol and drug problems. I don't see any way in the world we can begin to comply with all those requirements with a reduced staffing level. We're hard pressed to do it now." (Francke deposition, pp. 403–404)

III. SECURITY STAFFING:

1. A substantial increase in institutional population will create a need for additional security staff. (Beaver deposition, p. 12)

2. The opening of additional modular housing units for female prisoners at Western New Mexico Correctional Facility will create a need for additional security staff at that institution. (Beaver deposition, pp. 13–14)

3. Mr. C.W. Beaver, the Court's expert consultant on security staffing, determined that 145 correctional officers are required to provide minimally adequate security and safety for prisoners at Western New Mexico Correctional Facility. On December 31, 1985, only 128 correctional officers were employed at that institution. (Beaver deposition, pp. 26–30)[1]

1. Mr. Beaver's testimony concerning the number of correctional officers employed is consist-

4. Mr. C.W. Beaver, the Court's expert consultant on security staffing, determined that 197.8 correctional officers are required to provide minimally adequate security and safety for prisoners at Southern New Mexico Correctional Facility. As of February 17, 1986, 200 correctional officers were employed at that institution. (Beaver deposition, pp. 26–30)

5. When Mr. C.W. Beaver's security staffing recommendations for Central New Mexico Correctional Facility are adjusted to take into account the transfer of the Reception and Diagnostic Center as well as all female prisoners to Western New Mexico Correctional Facility, approximately 198 correctional officers are required to provide minimally adequate security and safety for prisoners at Central New Mexico Correctional Facility. (Special Master's Eighteenth Report, pp. 8–9) As of February 17, 1986, 202 correctional officers were employed at that institution. (Beaver deposition, p. 26)

6. Mr. C.W. Beaver, the Court's expert consultant on security staffing, determined that approximately 329.46 correctional officers are required to provide minimally adequate security and safety for prisoners at the Penitentiary of New Mexico—Main and the Penitentiary of New Mexico—North. On March 21, 1986, 302 correctional officers were employed in those facilities. (Beaver deposition, pp. 26, 31; Sullivan deposition, Exhibit 6)

7. As the result of the Fiscal Year 75 budget for the New Mexico Corrections Department, eight existing correctional officer positions will be eliminated at the Penitentiary of New Mexico (Main and North facilities), fourteen existing correctional officer positions will be eliminated at Central New Mexico Correctional Facility, fourteen existing correctional officer positions will be eliminated at Southern New

Mexico Correctional Facility and eight new correctional officer positions will be added to the complement at Western New Mexico Correctional Facility. (Stipulated finding no. 11)

8. Following the reduction in correctional officer positions, the Penitentiary of New Mexico (Main and North facilities) will be 35.46 correctional officer positions short of the minimal level of security staffing recommended by Mr. Beaver. Following the reductions in security staffing, Central New Mexico Correctional Facility will be 10 correctional officer positions short of the minimal level of security staffing recommended by Mr. Beaver, and Southern New Mexico Correctional Facility will be 12 correctional officer positions short of the minimal level of security staffing recommended by Mr. Beaver. Even with the increase of 8 correctional officer positions, Western New Mexico Correctional Facility will be 9 correctional officer positions short of the minimal level of security staffing recommended by Mr. Beaver. Moreover, the shortfall at Western New Mexico Correctional Facility fails to take into account the opening of new modular housing units for female prisoners, which were not considered by Mr. Beaver when he made his recommendation. (Beaver deposition, pp. 26, 30–31; Stipulated finding no. 11)

9. Security staff will be adversely affected by excessive overtime work as a result of the understaffing of the institutions subject to the Court's orders in this litigation. (Beaver deposition, p. 32) In addition, prisoners will be required to remain in their housing units for longer periods of time, and inmate idleness will increase. (Beaver deposition, pp. 32–33)

10. Prisoner idleness at Southern New Mexico Correctional Facility will increase as a result of staff reductions at that institution. (Francke deposition, p. 424)

ent with the unobjected to finding in the Special Master's twentieth report that the authorized correctional complement at WNMCF was 127 during Fiscal Year 74. *See* Twentieth Report, pp. 6–7 and fn. 5. It is inconsistent however, with the number (175) set forth in Exhibit B to Stipulated Finding No. 11. Exhibit B appears to reflect an error and is not credited by the Court. *See also* Finding 16, *infra,* which provides additional support to the Court's resolution of the factual conflict in the evidence concerning the authorized complement of security staff at Western New Mexico Correctional Facility during Fiscal Year 74.

11. The Court's expert consultant on security staffing testified that the security staff reductions that are contemplated will result in a "scenario at this time come July 1 (that) would be very similar to the scenario that occurred prior to the 1980 disturbance. ... I don't want to be a predictor of doom and tragedy, but I do think that it's a distinct possibility." (Beaver deposition, p. 33)

12. The Court's expert consultant on security staffing testified that "with the reduced staff, the likelihood of an emergency occurring is increased more than it is if they have adequate staff." (Beaver deposition, p. 49)

13. There is a direct, inverse correlation between the incidence of acts and threats of violence by and between inmates, on the one hand, and the types and amounts of educational, recreational, work and other programs available to inmates, on the other —i.e., acts and threats of violence tend to decrease as program availability and activity increase. (Stipulated testimony of Warden George Sullivan, Warden Dareld Kirby, Warden Eloy Mondragon and Warden Tom Newton)

14. The reduction in staffing at Central New Mexico Correctional Facility and Southern New Mexico Correctional Facility, coupled with the probable addition of 50 to 100 inmates at each of those facilities, will exacerbate inmate activity problems at those two institutions. (Francke deposition, p. 410)

15. Reduction in security staff positions will prevent the Corrections Department from complying with staff training requirements of the Court's order in *Duran v. Anaya.* (Francke deposition, p. 412)

16. The Corrections Department requested an increase of 27 security positions at Western New Mexico Correctional Facility for Fiscal Year 75. According to the Secretary of the New Mexico Corrections Department, "We simply don't have enough people over there to reach all the posts that we feel are necessary for good security." Certain priority security posts at Western New Mexico Correctional Facility are not covered at this time. (Francke deposition, p. 415; Exhibit 21 pp. 764, 767)

17. On February 18, 1986, the Secretary of the New Mexico Corrections Department made the following written statements to Governor Toney Anaya concerning proposed reductions in security staff:

The loss of security ... staff is compounded by the fact that our growth pattern for the next year will require us to use the day rooms for nearly 200 inmates by the end of FY75. The crowded conditions and increased tension will be dealt with by a reduced staff. (Exhibit 22, p. 3)

It seems that the only adequate lobbying component for corrections is a combination of blood and fire. To overcrowd Southern and Central on purpose with PNM-South standing vacant is unreasonable. To reduce the security staff and increase inmate idleness at the same time borders on the irresponsible. There will probably be people hurt and some may be killed during the coming year as these historically tranquil facilities react to these steps. (Exhibit 22, p. 3)

We do not have adequate staff at Western and PNM-North. The failure to add sufficient staff to these activities will impair our effectiveness and make the facilities more dangerous for inmates and staff alike. (Exhibit 22, p. 3)

Safety is going to take a significant drop as we lose security staff, idle more inmates and overcrowd the prisons. (Exhibit 22, p. 3)

Judge Burciaga will either act to restore the staffing cuts, order us to reduce population to match our resources or let the whole thing slide. If he does either of the first two we will be vindicated. If not, we can at least be confident that the decree will not be a management headache in the future, even if our prisons do regress. If this is the case, I will not envy the Secretary of Corrections his ability to discard the decree while he watches the toll of the inevitable disturbances rise. (Exhibit 22, p. 3)

## CONCLUSIONS OF LAW

■ 1. The Eighth Amendment is intended to protect and safeguard a prison inmate from an environment where degeneration is probable and self-improvement unlikely because of the conditions existing which inflict needless suffering, whether physical or mental. *Battle v. Anderson,* 564 F.2d 388, 393 (10th Cir.1977).

■ 2. Personal safety and medical care are core areas in any Eighth Amendment claim. *Ramos v. Lamm,* 639 F.2d 559, 566 (10th Cir.1980).

■ 3. A prisoner has a right to be reasonably protected from constant threats of violence and sexual assaults from other inmates. The failure to provide an adequate level of security staffing, which may significantly reduce the risk of such violence and assaults, constitutes deliberate indifference to the legitimate safety needs of prisoners. *Ramos v. Lamm, supra,* 639 F.2d at 572–73.

4. Defendants have a constitutional obligation to provide medical care for those whom it is punishing by incarceration. *Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976).

■ 5. Defendants have a constitutional obligation to make available to prisoners a level of medical care that is reasonably designed to meet the routine and emergency health care needs of prisoners. This includes medical treatment for inmates' physical ills, dental care and psychological or psychiatric care. *Ramos v. Lamm, supra,* 639 F.2d at 574.

■ 6. Only deliberate indifference to serious medical needs of prisoners violates the Eighth Amendment proscription against cruel and unusual punishment. Consequently, accidental or inadvertent failure to provide adequate medical care, or negligent diagnosis or treatment of a medical condition do not constitute a medical wrong under the Eighth Amendment. *Estelle v. Gamble, supra,* 429 U.S. at 106, 97 S.Ct. at 292.

7. A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. *Laaman v. Helgemoe,* 437 F.Supp. 269, 311 (D.N.H.1977).

■ 8. Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment. *Inmates of Allegheny Cty. Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979).

■ 9. Gross deficiencies in staffing establish deliberate indifference to prisoners' health needs. *Ramos v. Lamm, supra,* 639 F.2d at 575.

10. The function of a preliminary injunction is to preserve the status quo pending a final determination of the rights of the parties. *Penn v. San Juan Hospital, Inc.,* 528 F.2d 1181, 1185 (10th Cir.1975); *Continental Oil Co. v. Frontier Refining Co.,* 338 F.2d 780, 781 (10th Cir.1964).

11. In order to obtain a preliminary injunction, the moving party must establish (1) substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Lundgrin v. Claytor,* 619 F.2d 61, 63 (10th Cir.1980). Plaintiffs have met this burden with respect to proposed medical, mental health and security staffing reductions.

12. A showing that the remedy at law is inadequate to correct constitutional violations is a prerequisite to equitable relief in the form of an injunction. Thus, plaintiffs must establish that coercive sanctions obtained through a civil contempt proceeding will be inadequate to protect their constitu-

tional rights. *Newman v. State of Alabama,* 683 F.2d 1312, 1319 (11th Cir.1982). They have done so with respect to proposed medical, mental health and security staffing reductions.

■ 13. Lack of financing is not a defense to a failure to provide minimum constitutional standards. *Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir.1968).

■ 14. The fact that a court's equitable remedies implicate state funds is no bar to the court's exercise of its equitable powers. *Hutto v. Finney,* 437 U.S. 678, 690, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978); *Milliken v. Bradley,* 433 U.S. 267, 289, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977); *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974).

■ 15. In the exercise of its equitable powers to protect constitutional rights a court may restrict the sources from which monies are to be paid or transferred in order to protect the legal rights of those who have been victims of unconstitutional conduct. *United States v. Board of School Commissioners of City of Indianapolis,* 677 F.2d 1185, 1189–90 (7th Cir. 1982).

## DISCUSSION

■ A careful review of the relevant facts and controlling principles of law, as set forth above, has convinced the Court that a temporary injunction must issue granting some, but not all, the relief sought by plaintiffs in their motion. The areas affected by the proposed staffing reductions occasioned by the Corrections Department's Fiscal Year 75 budget constitute the core areas of any Eighth Amendment claim. *Ramos v. Lamm,* 639 F.2d 559, 566 (10th Cir.1980). Moreover, the proposed staffing reductions are substantial in nature. Even after retaining 19.6 unauthorized medical positions on a temporary or contract basis, on July 1, 1986 the Corrections Department will lose one of every five medical positions authorized in Fiscal Year 74. The effects of reductions

in mental health staff are even more dramatic. More than one-third of the positions authorized in Fiscal Year 74 will be lost in Fiscal Year 75. When 36 correctional security positions are subtracted from existing authorized complements at the Penitentiary of New Mexico, Central New Mexico Correctional Facility and Southern New Mexico Correctional Facility, the *minimal* level of security staffing required to provide reasonable security and safety for prisoners and staff will not be met at any of those institutions. The same will be true at Western New Mexico Correctional Facility in spite of the addition of eight correctional officer positions.

As a result of the reductions projected to occur on July 1, 1986, defendants will be unable to meet their constitutional obligation to provide a level of medical care that is reasonably designed to meet the routine and emergency health care needs of prisoners. This will be true with respect to medical care, dental care and psychiatric care. By implementing drastic reductions in the number of medical and mental health professionals available to treat prisoners, defendants will deny prisoners access to medical personnel capable of evaluating the need for treatment and providing necessary medical care. *Inmates of Allegheny Cty Jail v. Pierce,* 612 F.2d 754, 762 (3d Cir. 1979); *Ramos v. Lamm, supra,* 639 F.2d at 575. By reducing the level of security staffing below the minimal safety level recommended by the Court's expert consultant on security staffing, and below the level found by the Special Master and approved as necessary by the Court without objection from either party, defendants are significantly increasing the risk of violence and assaults and thus are evidencing deliberate indifference to the legitimate safety needs of prisoners. *Ramos v. Lamm, supra,* 639 F.2d at 572–73.

It is apparent that the medical and psychiatric needs of prisoners that will go unmet if proposed staffing reductions are implemented are serious ones. Unnecessary deaths, physical trauma, suicides and self-mutilation are virtually inevitable. Both

plaintiffs' and defendants' experts have testified that the impact of the proposed staffing reductions will make the delivery of satisfactory routine and emergent medical care impossible. As a result, prisoners will endure an unnecessary level of pain and suffering and will be the victims of irreparable physical and mental injury. In summary, the proposed staffing reductions in the medical and mental health areas reflect deliberate indifference to serious medical needs of prisoners in the four institutions under the Court's jurisdiction in this cause. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).

The evidence before the Court makes it abundantly clear that the Secretary of Corrections has attempted to persuade both the New Mexico Legislature and the Governor of New Mexico (the latter being a defendant in this action) to make sufficient funds available to avoid the dangerous and life threatening reductions in medical, mental health and security staff that are imminent. These efforts thus far have been to no avail. Nonetheless, defendants' constitutional obligations may not be avoided for lack of financing. *Jackson v. Bishop,* 404 F.2d 571, 580 (8th Cir.1968). Moreover, this Court's exercise of its equitable powers is not limited by the fact that needed equitable remedies implicate state funds. *Hutto v. Finney,* 437 U.S. 678, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978); *Milliken v. Bradley,* 433 U.S. 267, 289, 97 S.Ct. 2749, 2761, 53 L.Ed.2d 745 (1977).

Turning to the criteria that must be met for the issuance of a preliminary injunction, the Court finds that there is a substantial likelihood that plaintiffs eventually will prevail on the merits in upcoming hearings on plaintiffs' contempt motion and the parties' cross motions for modification insofar as those motions relate to medical, mental health and security staffing. There is no evidence before the Court that staffing reductions of the magnitude contemplated in the medical and mental health areas will permit the maintenance of minimal constitutional standards in these areas. Indeed, the Court's expert, plaintiffs' expert, defendants' expert and the New Mexico Secretary of Corrections all have testified to the contrary. Particularly in view of the steady increase in the penal population that will occur in New Mexico's incarcerated population, deficiencies outlined in earlier reports of the Special Master and in testimony before the Court in connection with the pending motion for preliminary injunction no doubt will be exacerbated. Likewise, the consistent evidence before the Court is that the level of psychiatric care being provided at this time, particularly to prisoners in need of acute care, is unacceptable by any conceivable measure or standard. All expert testimony is in agreement that the magnitude of mental health staffing reductions contemplated will eliminate essential mental health services. On the subject of security staffing, there is no credible evidence to contradict the expert assessment that minimal security staffing levels needed to provide a reasonably safe and secure environment for prisoners cannot be achieved if the contemplated reductions in security staffing occur. Even the conclusory statements of the four New Mexico wardens in their stipulated testimony that reduced security staffing levels will provide inmates with reasonable protection (assertions contradicted by the Secretary of Corrections) are conditioned on the continuation of current levels of inmate program availability and activity. The Secretary of Corrections himself has testified that such continuation is inconsistent with reductions in security staffing. In summary, plaintiffs have established a substantial likelihood that they eventually will prevail on the merits on the issues of medical, mental health and security staffing.

The Court is convinced beyond any doubt and finds that plaintiffs will suffer irreparable injury unless a preliminary injunction issues at this time. The medical and mental health programs currently in place will deteriorate rapidly if projected staffing cuts are implemented. The rebuilding of these programs, which are deficient even now in a number of important respects, is predicted by the Secretary of Corrections to require perhaps years of effort. Death,

extreme pain, self-mutilation and the other consequences of medical and mental health staffing reductions in evidence before the Court constitute irreparable injury in the most extreme sense of that term. Likewise, the prospect of increased rates of physical assault, rape and other forms of violence, testified to with almost complete certainty by the Secretary of Corrections, cannot be regarded as causing less than irreparable harm. The issues of the adequacy of the levels of medical, mental health and security staffing are matters of life and death, and not of mere trivial inconvenience, to prisoners within the New Mexico Corrections Department.[1]

A preliminary injunction prohibiting the implementation of staffing reductions on July 1, 1986 will create little if any damage to defendants. The plenary hearing on plaintiffs' contempt motion and the parties' cross motions for modification will provide a final resolution of the staffing issues before the Court at this time. In the unlikely event defendants ultimately should prevail on the merits on these issues, additional expenditures incurred between now and the time of a final resolution are not likely to be so great that they cannot be recouped to a large extent before the end of Fiscal Year 75. In any event, the preservation of human life and the protection of prisoners from violent assault and the agonies of acute physical or mental illness outweigh any monetary damage that defendants may suffer as the result of the issuance of this preliminary injunction.

Particularly in the State of New Mexico, which in 1980 suffered the bloodiest prison riot in the history of American corrections, it should be obvious that the public interest is served by the issuance of a preliminary injunction prohibiting defendants from reducing medical, mental health and security staffing to such an extent that the minimal constitutional rights of prisoners in maximum security and medium security institutions cannot be met. Respect for law, particularly by officials responsible for the administration of the State's correctional system, is in itself a matter of the highest public interest. The public at large is not served by unnecessary deaths and serious injuries, or by the willful or wanton infliction of pain and suffering on prisoners; nor is that interest served by the deterioration and dismantling of medical and mental health systems, or by the resultant increase in tension and frustration within institutions without adequate security staff to provide the most minimal level of safety and security to prisoners and staff.

In summary, perhaps Secretary Francke was correct when he stated, "It seems that the only adequate lobbying component for corrections is a combination of blood and fire." An eruption of blood and fire is a danger in any prison. To the extent of its ability and power, however, this Court will not permit that deadly combination to result from flagrant and transparent violations of the constitutional rights of prisoners in New Mexico's correctional institutions.[2]

1. It is clear that plaintiffs' remedy at law, coercive sanctions obtained through a civil contempt proceeding, will be inadequate to protect their constitutional rights. *Newman v. State of Alabama,* 683 F.2d 1312 (11th Cir.1982). Although plaintiffs' motion for contempt is pending, it will not be heard by the Court for several months. In the meantime, New Mexico prisoners would suffer irreparable harm if the staffing reductions were implemented commencing July 1, 1986. Moreover, the Court finds that the medical and mental health systems in place at this time would be seriously deteriorated and effectively dismantled by the time a final ruling on the merits could be made.

2. In this connection, the Court notes the opinion of the Corrections Department's Director of Ad-

ministrative Services that the reduction in the Department's budget was a punitive response to the consent decree entered in this case. John Kormanik testified, "My opinion is that the Legislature basically did not agree and has not agreed with the notion of a negotiated Consent Decree, and that they believe that the best way to make a point with the executive department, and specifically with the Department of Corrections as well as the federal courts, was to appropriate funds at a level that it would be very difficult, if possible—if not impossible, to meet those negotiated elements of the Consent Decree." (Kormanik deposition, p. 24) One legislator is reported to have remarked that "perhaps this appropriation would send a message to the federal judge that one appointed federal judge could not tell the Legislature of New Mexico

Although it is clear that plaintiffs are entitled to some relief at this time, they are not entitled to all elements of relief sought in their motion. The Court declines to prohibit staff reductions other than those relating to medical care, mental health care and security, as there is no evidence before the Court at this time that any such proposed reductions will adversely affect the minimal constitutional rights of prisoners. For the same reason, the Court refuses to order the rescission of any directive requiring an additional 2% reduction in the budget of the New Mexico Department of Corrections for Fiscal Year 75 or to enjoin any further reductions in the Department's budget. Any such budget reductions as may occur, however, will not be permitted to result in the unconstitutional reduction of the levels of medical, mental health or security staffing. Furthermore, it is not necessary at this time for the Court to order, in the alternative, the closing of any correctional institution in New Mexico. If necessary, a coercive remedy obtained through a civil contempt proceeding may well be sufficient to enforce the Court's preliminary injunction. Thus, a closure order, even in the alternative, appears at this time to be premature. *Newman v. State of Alabama*, 683 F.2d 1312 (11th Cir.1982).[3] Finally, the Court will not enjoin defendants to close dormitories at the Penitentiary of New Mexico in accordance with the stipulation and order entered on April 20, 1984. This matter is more properly addressed in the pending hearing on plaintiffs' contempt motion and will be reserved until that time.

An appropriate order shall be entered herewith.

## ORDER GRANTING PRELIMINARY INJUNCTION

The Court having entered findings of fact and conclusions of law in a Memorandum Opinion filed on this date, and upon careful review of the relevant facts and controlling principles of law relating to plaintiffs' motion for a preliminary injunction,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that defendants, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, are hereby ENJOINED to

a. refrain from eliminating any medical, mental health or security staff position, and from laying off for budgetary reasons (as opposed to terminating for cause) any employee currently filling any such position, that was authorized or temporarily approved for Fiscal Year 74 at the Penitentiary of New Mexico, Western New Mexico Correctional Facility, Central New Mexico Correctional Facility and Southern New Mexico Correctional Facility;

b. proceed forth to fill all vacant medical, mental health and security staff positions at the Penitentiary of New Mexico, Western New Mexico Correctional Facility, Central New Mexico Correctional Facility and Southern New Mexico Correctional Facility in order to bring the staff complements in these areas at these institutions to the levels authorized or temporarily approved during Fiscal Year 74; in addition to filling all such vacant positions at Western New Mexico Correctional Facility, proceed promptly after July 1, 1986 to employ the eight additional correctional officers authorized for that institution by the New Mexico Legislature for Fiscal Year 75;

c. to refrain, in the course of effecting compliance with subparagraphs A and B above, from transferring funds from other areas of the Corrections Department's budget in such a manner or to such an extent

---

how to run its business." (Kormanik deposition, p. 25) If Mr. Kormanik's testimony captures the level of the Legislature's sense of responsibility toward the State's correctional system, prisoners and free citizens, the lessons of 1980 indeed appear to have been short lived.

3. Of course, defendants, if they wish to do so, are free to close one or more institutions to reduce the levels of medical, mental health and security staffing needed on a system-wide basis.

that members of the plaintiff class will be deprived of any right to which they are entitled under the provisions of the consent decree or any other remedial order in this cause.

All other relief sought by plaintiffs in their motion for a preliminary injunction should be, and hereby is DENIED.